UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MATTHEW CALEB SAWYER                         CIVIL ACTION

VERSUS                                       NO: 21-482

KECIA CHARLES, ET AL.                        SECTION: "A" (5)

**ORDER AND REASONS**

The following motion is before the Court: **Motion to Dismiss Amended Complaint (Rec. Doc. 40)** filed by defendants KECIA CHARLES, sued in her individual capacity, DR. ABDUL KHAN, sued in his individual and official capacity, DR. ROBERT WOOD, sued in his individual capacity, JESSICA TROXCLAIR, sued in her individual capacity, ALVIN ROBINSON, sued in his individual capacity, LIEUTENANT JARED PERANIO, LIEUTENANT NORVEL ORAZIO, AMBER GROS, and DR. LAURENCE DURANTE, sued in his individual and official capacity.[1]  The plaintiff, Mr. Matthew Caleb Sawyer, pro se, has filed an opposition to the motion. The motion, originally submitted for consideration before the assigned magistrate judge on February 9, 2022, is now before this Court on the briefs without oral argument.[2]  For the following reasons, the

---

[1] Sawyer has voluntarily dismissed his claims against Lt. Peranio, Lt. Orazio, and Amber Gros. The motion to dismiss is therefore moot as to these defendants who have already been terminated by the Clerk of Court. Sawyer has also voluntarily abandoned any claim based on a civil conspiracy theory. Further, Sawyer has clarified in his opposition that Dr. Wood, although omitted from the "parties" section of the Amended Complaint, is a defendant in his individual capacity.

[2] The motion to dismiss was noticed for submission before the assigned magistrate judge to whom the case was referred until one of the parties objected to the automatic referral. In this district prisoner cases brought pursuant to 42 U.S.C. § 1983 are automatically referred to a

motion is GRANTED IN PART AND DENIED IN PART.

## I.    Background

The plaintiff, Mr. Matthew Caleb Sawyer (hereinafter "Sawyer"), is a convicted prisoner (since December 4, 2017) in the custody of the Louisiana Department of Public Safety and Corrections. Sawyer is proceeding pro se in this matter.[3] The events giving rise to Sawyer's claims occurred while he was housed at the Nelson Coleman Correctional Center ("NCCC"). Sawyer was housed at NCCC until February 2, 2021, when he was transferred to LA Workforce in Dequincy, LA—an occurrence that Sawyer believes was ill-advised in light of his health issues, and therefore likely taken in retaliation for various grievances that he was pursuing while housed at NCCC.[4] Sawyer has brought claims in this matter grounded on the contention that Defendants were deliberately indifferent to his serious medical needs, and further violated his rights by opening his legal mail outside of his presence. Sawyer believes that there is actually a connection between these two seemingly unconnected legal claims. Sawyer's claims

---

magistrate judge. L.R. 73.2(A). The referral order was vacated on February 15, 2022 (Rec. Doc. 53, Order), and the pending motion to dismiss was transferred to this Court's motion calendar.

[3] Sawyer filed three motions during the course of this case to have an attorney appointed to represent him. The magistrate judge denied those motions (once without prejudice while the case was stayed) and this Court denied Sawyer's objection when he sought review. (Rec. Doc. 48, Order). The Court observes that Sawyer's pleadings are well organized, well-written, and well-researched. Moreover, Sawyer's opposition memorandum, for which Sawyer prepared a Table of Contents, evinces an impressive understanding of the confines of the Court's inquiry in conjunction with a Rule 12(b)(6) motion to dismiss. Thus, notwithstanding the outcome of this ruling, the Court is persuaded that in light of Sawyer's excellent ability to express himself in writing coupled with the mandatory liberal construction given his pro se pleadings by the Court, his lack of an attorney has in no way contributed to Defendants' success on this motion.

[4] Sawyer was subsequently transferred to Catahoula Correctional Facility, and later to Madison Parish Correctional Center in Tallulah, Louisiana, his current location.

are brought under the auspices of 42 U.S.C. § 1983, which "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred."[5] *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 144, n. 3 (1979)).

The relevant allegations are essentially as follows: In 2018, while housed at NCCC, Sawyer sought medical treatment for complaints of lower back and neck joint pain. Dr. Durante, a named defendant, was the physician who evaluated him. Sawyer advised Dr. Durante that he had "used needles" so Dr. Durante ordered a Hepatitis Panel. (Rec. Doc. 47, Opposition at 6). Sawyer was prescribed medication to address the pain but he alleges that his health began to decline drastically. (Rec. Doc. 32, Amended Complaint at 7 ¶ 3). In November 2020, Sawyer sought and obtained access to his medical records, and he alleges that while he was perusing them he "stumbled across" a blood test from March 2018 that indicated that he was positive for Hepatitis C ("Hep-C"). (*Id.* at 8 ¶ 4). Sawyer complains that he was never informed of the positive test result even though Hep-C is a deadly virus, and that he was not given the follow-up test recommended by the CDC for his test result. (*Id.* at 8 ¶ 5). The only NCCC medical provider clearly identified on the lab report is Dr. Durante. (Rec. Doc. 47-2, Sawyer Exhibit B). The copy of the lab report contains the illegible initials of someone, likely on the prison's medical staff, dated 3/22/18, who presumably received and reviewed the report. (*Id.*). Thus, while it is clear that NCCC received the 2018 lab report, Sawyer has

---

[5] The Court notes that Sawyer has attempted to file claims against the medical staff and warden at the Madison Parish Correctional Center alleging deliberate indifference to his serious medical needs and violations pertaining to legal mail. (CA22-602, Western District of Louisiana).

been unable to determine (although he tried through the grievance process) why the report was filed into his medical record with no follow-up by the medical staff in terms of informing him of the result and performing the CDC's recommended follow-up testing. Sawyer alleges that the NCCC medical staff should have had in place a policy to deal with prisoners with chronic conditions such as Hep-C. (Amended Complaint at 13 ¶ 24). Sawyer alleges that he has several of the medical conditions that may be associated with Hep-C, (*Id.* at 14 ¶¶ 26, 27), and that because he was not evaluated for Hep-C for almost three years, no one knows how high his viral load might have gotten during that time period, and he may now have life-long injuries and damage to his body as a result of NCCC's failure to act.[6] (*Id.* at 12, 18 ¶¶ 20, 35).

Importantly, after Sawyer discovered the March 2018 Hep-C test result and requested follow-up treatment, Dr. Kahn (who replaced Dr. Durante) and Nurse Kecia Charles—both of whom are named defendants—arranged medical referrals for Gastroenterology and other Hep-C follow-up work. (Rec .Doc. 47-2, Sawyer Exhibits D & E). Further, Dr. Kahn ordered additional testing to confirm the Hep-C diagnosis and blood was drawn in December 2020. (*Id.* Sawyer Exhibits F, G, H, M). These tests appear to have inconsistent results in terms of whether Hep-C was detected. Sawyer suggests that Nurse Charles, who drew his blood, either did not provide enough blood to the lab or tampered with the sample and he suggests that she did that intentionally

---

[6] The Court pauses here to point out that Sawyer has never been diagnosed with Hep-C. HEP-C is not even mentioned among the litany of medical conditions that Sawyer alleges in his most recent complaint filed in the Western District of Louisiana.

because Sawyer had complained about NCCC's failure to act on the March 2018 test result.[7]  (Amended Complaint at 17 ¶ 34).

According to Sawyer's complaint, Dr. Durante was employed by NCCC as its medical director until he retired in 2020, when he was replaced by Dr. Kahn. Sawyer contends that Dr. Durante's failure to inform him of the test result and to order the recommended follow-up testing constitutes a deliberate indifference to his serious medical needs in violation of the Eighth Amendment.[8]  (Amended Complaint at 8 ¶ 6).

Sawyer is not persuaded, however, that NCCC's deliberate indifference to his serious medical needs stopped with the failure to act on the March 2018 Hep-C test result. Sawyer had a tele-medicine video visit with a neurologist on December 8, 2020 and the neurologist ordered an "EMG/NCV on all 4 extremities" to check for nerve damage. (*Id.* at 9 ¶ 8). Sawyer informed the neurologist of the Hep-C positivity, for

---

[7]  Sawyer attaches great significance to the fact that the Total Volume field on each of the December 2020 lab reports says ""Not Provided." Sawyer interprets this to mean that the lab did not receive a sufficient volume of blood from NCCC to conduct the Hep-C test—in other words, the basis of his claim against Nurse Charles—but the Court does not agree that this interpretation by Sawyer is correct, and this interpretation appears to have no objective support. In fact, for the sample taken on December 20, 2020, the lab was express in explaining that it could not do multiple tests with only one specimen. (Rec. Doc. 47-2, Sawyer Exhibit M). And for the test that was performed, the report shows that "HCV RNA not detected," and there is no suggestion that blood volume was deficient for purposes of that test. (*Id.*).

[8]  It is not clear to the Court exactly when in 2020 Dr. Durante left NCCC and Dr. Kahn took over as medical director. Both physicians are sued both individually and in their official capacities as medical director. The individual capacity claims require personal involvement by the specific defendant that the plaintiff claims violated his constitutional rights. *See Jones v. Lowndes County*, 678 F.3d 344, 349 (5th Cir. 2012) (citing *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008)). Thus, the Court interprets the claims such that Dr. Durante is being sued for the failure to take action based on the March 2018 test result and Dr. Kahn is being sued for anything that happened after November 2020 when Sawyer discovered the earlier test result and brought it to Dr. Kahn's attention.

which the neurologist recommended a "host of bloodwork," and other tests with a follow-up visit to take place within 3-4 months. (*Id.* at 9 ¶ 9). But the only recommendation that NCCC fulfilled was the EMG/NCV, to check his nerves and even this was only carried out after Sawyer filed a grievance. (*Id.* at 9-10 ¶ 10).

Paragraphs 26 through 28 of the Amended Complaint pertain to the defendant Dr. Wood's treatment of Sawyer while he was at NCCC, although the timeframe that this treatment occurred is not clear to the Court. As the Court appreciates Sawyer's claims against Dr. Wood, that physician informed him that his ailments were not related to Hep-C, and that any liver complaints that Sawyer might have were more likely caused by the doses of Cymbalta that he was taking.[9] (Amended Complaint at 15 ¶ 28).

In conjunction with his claim that NCCC did not provide adequate medical care such that he was the victim of deliberate indifference to his serious medical needs, Sawyer seeks compensatory and punitive damages from all of the medical defendants, Kecia Charles, Dr. Kahn, Dr. Wood, and Dr. Durante. Sawyer also seeks injunctive relief against Dr. Kahn and Kecia Charles to compel them to adopt a policy (should it be determined that one does not currently exist) setting forth the requirements to be followed by the medical staff for inmates who test positive for a virus or any chronic condition.[10] (Amended Complaint at 25 ¶ C(1)).

---

[9] The Court notes that even the treating neurologist Dr. Mader, who is not named as a defendant, has a notation in his notes that he informed Sawyer that his spine problems were most likely congenital in nature. (Rec. Doc. 47-2, Sawyer Exhibit I).

[10] The Court pauses here to note that Sawyer lacks standing to seek injunctive relief on behalf of other NCCC inmates who have tested positive for chronic conditions. (Amended Complaint at 26 ¶ C(2)). Further, two of his claims for injunctive relief are more akin to discovery requests.

On January 29, 2021, pursuant to a directive by the Secretary of the Louisiana Department of Public Safety & Corrections ("DOC"), certain inmates were identified to be transferred on February 2, 2021, to LA Workforce in Dequincy, Louisiana, "a minimum facility."[11] (Rec. Doc. 47-2, Sawyer Exhibit L). Sawyer was one of those inmates selected by the Secretary—not by the NCCC staff—for transfer and it occurred as scheduled. Sawyer's complaint is that even though he had a host of medical conditions, and a follow-up visit scheduled with the neurologist for March 2021, NCCC's staff did nothing to stop the transfer, which caused him to lose his follow-up neurological appointment and the benefit of any of his then-treating physician's recommendations. (Amended Complaint at 11 ¶ 14). Sawyer points out that the DOC directive states: "Please advise if these offenders are no longer housed at your facility, . . . or *if these offenders have any medical issues* or detainers *that may not allow these offenders to function in a minimum facility,*" which means that NCCC could have prevented the transfer. (Rec. Doc. 47-2, Sawyer Exhibit L (emphasis added)). Sawyer complains that as a "minimum facility" LA Workforce was unable to provide for his health concerns, and that the facility's medical director essentially told him such. (Amended Complaint at 11-12 ¶ 17). Sawyer believes that NCCC did not intervene to stop the transfer because he was actively pursuing and in the final stages of at least two grievances, one related to

_____

(Amended Complaint at 25 ¶ B) (completion of the grievance process so that plaintiff can obtain essential information to prepare his case for trial); (Amended Complaint at 25 ¶ C) (production of a copy of the policy that sets forth the requirements for the medical staff to follow when an inmate tests positive for a virus or any chronic condition).

[11] The Secretary's letter says "a minimum facility." The Court assumes that this means a minimum security facility.

the Hep-C test and another related to NCCC's opening of his legal mail, a claim

described in greater detail below. (*Id.* at 12 ¶ 19). Sawyer wrote to NCCC about trying to

continue with the grievances via mail since he is no longer housed at the facility but he

did not receive a response. (Amended Complaint at 13 ¶ 23). Thus, Sawyer believes he

was the victim of retaliation for filing grievances and that such retaliation was in violation

of his constitutional rights. (*Id.* at 13 ¶ 21).

In conjunction with his claim that NCCC should not have allowed the transfer to

Dequincy, Sawyer seeks compensatory and punitive damages from Warden Alvin

Robinson under a First Amendment retaliation theory.

In addition to filing grievances pertaining to his medical treatment while housed at

NCCC, Sawyer also complained during his time at NCCC that his incoming mail

designated as "legal mail" was being opened by the prison staff outside of his presence.

Sawyer filed a grievance challenging this policy as being illegal and in violation of his

rights. As the Court appreciates the procedure used at NCCC, inmates do not receive

actual physical mail, a practice not unusual in a prison setting. Rather, the prison staff

opens the inmate's mail and scans it to a kiosk system where the inmate can then

review the mail electronically. The same procedure is used for legal mail as for other

mail except that the original of legal mail is placed in an archive file where it is secured.

(Amended Complaint at 20-21 ¶ 45). Various staff members at NCCC, including

Captain/Assistant Warden Jessica Troxclair and Warden Alvin Robinson, responded to

Sawyer's grievances about the procedure explaining that the mail policy was legal and

permissible under federal law. (*Id.* at 22 ¶¶ 49, 50). Sawyer maintains that by opening

his legal mail *outside of his presence* the staff at NCCC violated his First and Sixth Amendment rights. (*Id.* at 23 ¶ 53). Sawyer posits that since his legal mail might have been read by the staff at NCCC thereby making NCCC aware that he had been corresponding with a civil attorney regarding his medical concerns, this could have been a contributing factor to him being transferred to Dequincy, thereby connecting his retaliation and legal mail claims. (*Id.* at 23-24 ¶ 54).

In conjunction with his claim that NCCC maintains an unlawful policy of opening inmate legal mail outside of the inmate's presence, and that staff at NCCC in fact opened his legal mail outside of his presence, Sawyer seeks damages from Warden Alvin Robinson and Assistant Warden Jessica Troxclair. Sawyer also seeks related declaratory and injunctive relief.

Defendants now move to dismiss all of Sawyer's claims pursuant to Federal Rule of Civil Procedure 12(b)(6), contending that Sawyer's allegations fail to state a claim upon which relief can be granted.

## II.    Discussion

In the context of a motion to dismiss the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights*, Ltd., 551 U.S. 308 (2007); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Lovick v. Ritemoney, Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004)). However, the foregoing tenet is inapplicable to legal conclusions. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Thread-bare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice. *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550, U.S. 544, 555 (2007)).

The central issue in a Rule 12(b)(6) motion to dismiss is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief. *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (quoting *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)). To avoid dismissal, a plaintiff must plead sufficient facts to "state a claim for relief that is plausible on its face." *Id.* (quoting *Iqbal*, 129 S. Ct. at 1949). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Id.* (quoting *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)). Legal conclusions must be supported by factual allegations. *Id.* (quoting *Iqbal*, 129 S. Ct. at 1950).

In addition to the foregoing general principles pertaining to motions to dismiss, several other general principles have broad application in this case. First, it is well-settled that when considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings, including attachments thereto. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). While Sawyer did not attach his medical records or other documents to his complaint, Defendants attached the medical records to their motion to dismiss and have contended that the records may be properly considered because they are referred to in Sawyer's pleadings and are central to his deliberate indifference claims. (Rec. Doc. 40-1, Memorandum in

Support at 7). As in *Collins* wherein the Fifth Circuit approved such a procedure, the Court is persuaded that the medical records are appropriately considered in establishing the basis of the suit, and in assisting the Court in making the elementary determination of whether a claim has been stated. *Id.* at 498-99 (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993)). Moreover, Sawyer has likewise attached some of the records to his opposition, as well as other documents such as the DOC's January 29, 2021 letter, and some of NCCC's responses to his grievances, all of which he contends militate in favor of determining that he states a claim for relief. Given then that both sides have agreed without objection that the documents provided may be considered in conjunction with this Rule 12(b)(6) motion, the Court has considered them.

Second, as with all claims against an official in his individual or personal capacity, a § 1983 claimant must establish that the defendant was either personally involved in a constitutional deprivation or that his wrongful actions were causally connected to the constitutional deprivation. *See Jones, supra* note 8. Section 1983 does not allow for liability based on the theory of respondeat superior; a supervisor is not personally liable for his subordinate's conduct in which he had no involvement. *Jones*, 678 F.3d at 349. A shotgun approach to pleading individual capacity claims will not suffice. Instead, the individual capacity claims must be evaluated on a defendant by defendant basis, and the Court must be able to identify allegations specific to each defendant that Sawyer is attempting to hold personally liable for violating his specific rights.

Finally, it is important to remain mindful that as to all of the defendants in this case, the official capacity claims are going to be extremely narrow given that at all times pertinent they were employees of the Department of Corrections, which is a state agency. Official capacity claims generally represent only another way of pleading an action against an entity of which the officer is an agent. *Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.*, 229 F.3d 478, 483 (5th Cir. 2000) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). Thus, any monetary claims against the defendants in their official capacities are barred by the Eleventh Amendment, the same as if the relief had been sought against the state directly as a defendant. *See K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010) (citing *Hutto v. Finney*, 437 U.S. 678, 700 (1978)); *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 61 (1989) (recognizing that a suit against a state official in an official capacity for monetary damages is treated as a suit against the state and is therefore barred by the Eleventh Amendment). In fact, the only relief that may be awarded against any of the defendants in their official capacities is prospective injunctive relief which would apply only if one of them is enforcing an unconstitutional law or policy resulting in a violation of Sawyer's rights. *See K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010) (citing *Ex Parte Young*, 209 U.S. 123 (1908)).

### A.  Deliberate Indifference to Serious Medical Needs

In support of their Rule 12(b)(6) motion to dismiss Sawyer's Amended Complaint, Defendants argue that Sawyer's allegations as to his medical treatment do not rise to the level of constitutionally inadequate medical care. Defendants argue that Sawyer was

never denied treatment and that he simply disagrees with his physicians' medical judgment, which cannot form the basis for relief under controlling law.

Deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical or intentionally interfering with the treatment once prescribed. *Id.*

In the context of medical care, a prison official violates the Eighth Amendment prohibition against cruel and unusual punishment when he acts with deliberate indifference to a prisoner's serious medical needs. *Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 754 (5th Cir. 2001) (citing *Gamble,* 429 U.S. at 105–06). Deliberate indifference to a prisoner's serious medical needs is actionable pursuant to 42 U.S.C. § 1983. *Gamble*, 429 U.S. at 105.

A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required. *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006) (citing *Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1187 (11th Cir.1994)). The claim has objective and subjective components. *Rogers v. Boatright*, 709 F.3d 403, 407–08 (5th Cir. 2013) (citing *Palmer v. Johnson,* 193 F.3d 346, 352 (5th Cir.1999)). The deprivation alleged must be "objectively, sufficiently serious," and the prison official sued must have a

sufficiently culpable state of mind—that is, the official must have been deliberately indifferent to the prisoner's health and safety. *Id.* To establish deliberate indifference, the prisoner must show that the defendant (1) was aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn, and (2) that he actually drew an inference that such potential for harm existed. *Id.* A prison official acts with deliberate indifference only if he disregards a substantial risk of serious bodily harm by failing to take reasonable measures to abate it. *Gobert*, 463 F.3d at 346 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Unsuccessful medical treatments, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment absent exceptional circumstances. *Gobert*, 463 F.3d at 346 (citing *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *Varnado v. Lynaugh*, 920 F.2d 320, 3 (5th Cir. 1991); *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999)). The decision whether to provide additional treatment is a classic example of a matter of medical judgment. *Gobert*, 463 F.3d at 346 (citing *Domino*, 239 F.3d at 756). A showing of deliberate indifference requires the prisoner to submit evidence that prison officials "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Gobert*, 463 F.3d at 346 (quoting *Domino*, 239 F.3d at 756). Deliberate indifference is an extremely high standard to meet. *Id.* (quoting *Domino*, 239 F.3d at 756; *Hernandez v. Tex. Dept. of Protective & Regulatory Servs.*, 380 F.3d 872, 882 (5th Cir. 2004)).

Similarly, in the medical context, an inadvertent failure to provide adequate

medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." *Gamble*, 429 U.S. at 105-06. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. *Id.* Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. *Id.*; *see Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

Sawyer's Eighth Amendment medical claims begin with the March 2018 Hepatitis Panel that was ordered by Dr. Durante. Mindful that the March 2018 lab report does not purport to confirm a diagnosis of Hep-C, the case law recognizes that Hepatitis C qualifies as a serious condition for purposes of an Eighth Amendment analysis, *see, e.g.*, *Johnson v. Wright*, 234 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) (citing *McKenna v. Wright,* 2002 WL 338375, at *8 (S.D.N.Y. Mar.4, 2002); *Carbonell v. Goord,* 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000)). It is certainly not a stretch to acknowledge at the pleading stage that Hep-C, if not properly treated may lead to severe illness. *Johnson*, 234 F. Supp. 2d at 360. Yet it is undisputed that no action was taken with respect to that test result until Sawyer discovered the test result in November 2020 and pressed the issue.

The Court construes the facts in favor of Sawyer such that Dr. Durante actually saw the March 2018 lab report and yet decided to take no follow-up action on the result.[12] The Amended Complaint contains no allegations as to any other defendant

---

[12] If Dr. Durante did not see the report in 2018 then he could not have been deliberately

being personally involved in the decision to take no further action. Thus, liability for an

Eighth Amendment violation pertaining to the March 2018 report can only potentially lie

with Dr. Durante.

Of course, at this juncture Dr. Durante's reason(s) for failing to follow-up on the

March 2018 test result is not known. As the motion points out, Sawyer was not

exhibiting symptoms of Hep-C back in March 2018 when the panel was ordered so this

is not a case where a physician ignored the obvious symptoms of Hep-C. Thus, the

doctor may have concluded that follow-up testing was not necessary as a matter of

medical judgment. Even if the Court or Sawyer might believe as lay persons that follow-

up testing would have been the prudent thing to do, disagreement with Dr. Durante's

medical judgment is not actionable as a constitutional violation. Or Dr. Durante could

have simply meant to order the test and forgotten, or not have read the report carefully

enough to note the result—acts that one might argue constitute negligence but as such

would not be actionable as constitutional violations. To be clear, the Court is not

characterizing Dr. Durante's conduct as negligent or imprudent.

Sawyer's claim for deliberate indifference against Dr. Durante fails because none

of the facts alleged support the inference that Dr. Durante's failure to order follow-up

care, assuming as the Court must at this stage that it should have been done, evinces

deliberate indifference as opposed to either an exercise of medical judgment or even

---

indifferent to Sawyer's serious medical needs. Even in that scenario, we know that someone on
the NCCC medical staff did see the lab report because of the illegible initials on its face but
there is no basis to assume that this individual had any decision-making authority with respect
to an inmate's medical treatment.

negligence. And that Dr. Durante might not have followed the CDC recommendation for follow-up care recited on the lab report (assuming that the lab report correctly reports that recommendation and that it validly establishes a standard of care) in Sawyer's particular case is not indicative of either. There are no facts alleged to suggest that Dr. Durante either refused to treat Sawyer, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for Sawyer's serious medical needs. Given that Sawyer had only arrived at NCCC in December 2017, which was just a few months before the March 2018 test, there is not even a plausible inference that Dr. Durante had developed a particular dislike for his patient. Simply, the facts alleged do not remove this case from the realm of the very type of medical claims that are not actionable under § 1983. The motion to dismiss is therefore GRANTED as to the deliberate indifference claims against Dr. Durante arising out the March 2018 lab report in both his individual and official capacities. Furthermore, the motion to dismiss is GRANTED as to all other defendants on this claim because Sawyer does not allege that any of them were personally involved in the decision to take no follow-up action after the March 2018 report.[13]

---

[13] Defendants raised a prescription argument for the first time in their reply memorandum. (Rec. Doc. 51, Reply at 3-4). While Defendants are correct in pointing out that Louisiana's one-year prescriptive period applies to Sawyer's § 1983 claim, Defendants are not correct in asserting that prescription will necessarily bar redress for any complaints occurring prior to March 8, 2020 (Sawyer's original complaint was filed on March 8, 2021). Under federal law, which governs when a § 1983 cause of action accrues, the plaintiff must know or have reason to know of the injury which is the basis of the action. *Smith v. Regional Trans. Auth.*, 827 F.3d 412, 421 (5th Cir. 2016) (citing *Gartrell v. Gaylor*, 981 F.2d 254, 257 (5th Cir. 1993)). And the state's tolling rules (such as Louisiana's discovery rule) apply as well as the state's statute of limitations. *See Bd. of Regents v. Tomanio*, 446 U.S. 478 (1980). Sawyer has alleged that he did not "discover" the facts giving rise to his Eighth Amendment medical claim based on the March 2018 report until he perused his medical file in November 2020 and learned of the Hep-C test result.

The Eighth Amendment deliberate indifference claims are even more lacking as to the remaining medical defendants, Dr. Wood, Dr. Kahn, and Nurse Charles.[14] As to Dr. Kahn, who had taken over for Dr. Durante after his retirement and was therefore in his position when Sawyer discovered the March 2018 report, the Court is at an utter loss to discern from the allegations how this physician was deliberately indifferent to Sawyer's serious medical needs. Dr. Kahn arranged for medical referrals and additional Hep-C testing once Sawyer brought the March 2018 report to his attention. As for Dr. Wood, it appears from the allegations that Sawyer faults him with not concurring in Sawyer's own judgment as to his medical issues. None of the allegations against Drs. Kahn and Wood state a claim for relief under any legal theory.

As for Nurse Charles, she is accused of intentionally taking blood samples of insufficient volume to provide the lab for Sawyer's follow-up lab testing. The allegations against Nurse Charles do not pass the plausibility hurdle because the very lab reports that Sawyer points to in support of this claim do not suggest that the lab actually received insufficient blood volume. Further, even if the blood samples had been deficient, the allegation that Nurse Charles did so intentionally is conclusory and wholly unsupported by factual support.[15] The motion to dismiss is GRANTED as to Dr. Kahn,

---

[14] There is no suggestion that Warden Robinson and Assistant Warden Jessica Troxclair had anything to do with medical decisions pertaining to Sawyer.

[15] Sawyer posits that Nurse Charles would have done so intentionally because he filed a grievance about the March 2018 test but it is not clear that Nurse Charles had anything to do with that test or that she even worked at NCCC at the time. Thus, the unsupported and conclusory allegation as to intent is implausible for lack of supporting allegations.

Dr. Wood, and Nurse Kecia Charles in both their individual and official capacities.

### B.   Retaliation

Sawyer's retaliation claim is based on his February 2, 2021 transfer to LA Workforce in Dequincy, LA, an occurrence that Sawyer believes was ill-advised in light of his health issues, and one that caused him to lose the benefit of the medical care that had been scheduled for him in the spring of 2021. This claim is presumably brought against Warden Robinson only and in his personal capacity. There is no suggestion, nor could there be a plausible one based on the DOC's January 29, 2021 directive that identified Sawyer for transfer, that Warden Robinson *initiated* the transfer process in retaliation for Sawyer's grievance activity and that is not the nature of Sawyer's claim.[16] Rather, Sawyer contends that Warden Robinson should have intervened to stop the transfer and that his failure to do so constitutes actionable retaliation under § 1983.

A prison official may not retaliate against or harass an inmate for complaining through proper channels about misconduct at the facility. *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006) (citing *Woods v. Smith,* 60 F.3d 1161, 1164 (5th Cir.1995)). To sustain a § 1983 retaliation claim, the plaintiff must allege: (1) the existence of a specific constitutional right; (2) the defendant's intent to retaliate for the exercise of that right; (3) a retaliatory adverse act; and (4) causation. *Freeman v. Texas Dep't of Crim. Just.*, 369 F.3d 854, 863 (5th Cir. 2004) (citing *Woods,* 60 F.3d at 1166).

---

[16] In the memorandum in support, Warden Robinson focused on the fact that he did not initiate the transfer to DeQuincy but Sawyer has never claimed that the warden did so. In the reply memorandum, Warden Robinson did address Sawyer's claim he should have prevented the transfer.

Filing grievances is a constitutionally protected activity. *Gonzales v. Gross*, 779 F. App'x 227, 230 (5th Cir. 2019) (citing *Brown v. Taylor*, 911 F.3d 235, 245 (5th Cir. 2018)). The Court assumes without deciding that the transfer to LA Workforce in Dequincy, LA is an adverse act that rises to the level of a constitutional violation. *See Morris*, 449 F.3d at 684-85 (citing *Jones v. Greninger*, 188 F.3d 322, 325-26 (5th Cir. 1999)). The Court will also assume two important factual underpinnings to this claim—that the transfer was in fact inappropriate for an inmate like Sawyer, and that Warden Robinson knew that the transfer was not appropriate for Sawyer in light of his health conditions.[17]

In support of their Rule 12(b)(6) motion to dismiss Warden Robinson *argues* that contrary to Sawyer's claim, a minimum facility does allow an inmate to have medical visits with outside doctors. Warden Robinson also *argues* that he had no legal authority to stop the transfer.

The Court reminds Warden Robinson that this matter is before the Court on a Rule 12(b)(6) motion to dismiss. Arguments of counsel contained in briefing cannot overcome Sawyer's allegations. The Court must accept as true at the pleading stage Sawyer's contention that the Dequincy, LA facility was inadequate for his medical needs because the facility does not provide appointments with "outside specialist[s]." (Amended Complaint at 12 ¶ 17). To add plausibility to this allegation, Sawyer alleges

---

[17] Warden Robinson knew from the grievance process that Sawyer had "health" issues but that does not mean that he would have necessarily known the specifics of Sawyer's medical treatment or that the DeQuincy facility was not appropriate for Sawyer, assuming again that this was in fact the case.

that the medical director at Dequincy told him that "he should have never been transferred to a work camp with his ongoing health issues," (*id.*), and that the medical director acted on this assertion by arranging for Sawyer to be relocated to a proper medical facility to receive proper treatment, (*id.* ¶ 18). Warden Robinson's attempt in the reply to dispute this aspect of Sawyer's claim crosses beyond the scope of an appropriate motion to dismiss inquiry.

As to Sawyer's allegation that Warden Robinson should have intervened to stop the transfer to DeQuincy, Warden Robinson argues that only the Secretary of DOC has the authority to relocate (or not) inmates in the state system, and therefore there is nothing that he could have done to prevent the transfer. Warden Robinson's arguments go to the causation element of the retaliation claim because to show causation a plaintiff must allege that "but for the retaliatory motive . . . the complained of incident . . . would not have occurred." *Gonzales*, 779 F. App'x at 230 (quoting *Woods*, 60 F.3d at 1166). And of course, the warden's contention is that the transfer would have occurred no matter what given his inability to stop it.

The difficulty that the Court has in crediting the warden's arguments in this vein at the Rule 12(b)(6) stage is that the January 29, 2021 letter—which the parties have made part of the pleadings—clearly states that the facility should advise if any of the listed offenders have medical issues that would not allow the offender to function in "a minimum facility." It states in bold in two places that "**[i]f cancellations or arrangements need to be made, please respond via email to . . . to ensure that the message is received.**" (Rec. Doc. 47-2, Sawyer Exhibit L) (bold in original). The letter

provides not only an email address to send notification of cancellations but also a fax number and a cell phone number. Whether the DOC would have actually honored Warden Robinson's request had he attempted to intervene on Sawyer's behalf is not at issue nor is the question whether Sawyer's condition actually merited intervention. The Court concludes only that at the Rule 12(b)(6) stage it cannot ignore the clear text of the January 29, 2021 letter to credit the warden's assertion that he was powerless to request that Sawyer not be transferred.

Moreover, Warden Robinson's qualified immunity defense cannot carry the day at the pleading stage. If Warden Robinson should have intervened in the transfer in light of Sawyer's medical issues but declined to do so in retaliation for Sawyer's activity in filing numerous grievances—and this is what Sawyer alleges—then an official in Warden Robinson's position would have known that under clearly established law this would violate Sawyer's First Amendment rights and doing so would have been objectively unreasonable. *See Cantrell v. City of Murphy*, 666 F.3d 911, 922 (5th Cir. 2012) (citing *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007)).

The motion to dismiss is therefore denied as to the retaliation claim against Warden Robinson in his individual capacity. The motion to dismiss is granted as to the official capacity claims against Warden Robinson because prospective injunctive relief does not apply to this claim.

### C. Legal Mail

In support of their Rule 12(b)(6) motion to dismiss Sawyer's claims pertaining to his legal mail, the defendants sued in conjunction with this claim—Warden Robinson

and Assistant Warden Jessica Troxclair—argue that Sawyer simply misunderstands the governing law and has sued them for nothing more than advising him as to the correct status of the law governing legal mail. Alternatively, Defendants argue that they are entitled to qualified immunity.

Sawyer's legal mail claims involve an incident that occurred on December 3, 2020, when he discovered that his legal mail, clearly labeled as such, from a civil attorney had been opened outside of his presence and scanned into the prison's kiosk system. (Amended Complaint at 19 ¶ 38). As explained above, this is NCCC's routine for all incoming inmate mail, whether non-legal or legal. Sawyer exhausted a grievance challenging this procedure as it pertains to legal mail but the prison's officials repeatedly advised him that the procedure was legal under controlling law. Sawyer questions their appreciation of the law in this area and contends that the opening of his mail on December 3, 2020, constituted a violation of his First and Sixth Amendment rights, and that NCCC's policy of having the staff open incoming legal mail outside the presence of the inmate is unconstitutional.[18]

At the outset, the Court notes that neither Assistant Warden Troxclair nor Warden Robinson are alleged to have been personally involved in opening Sawyer's legal mail either on December 3, 2020, or at any other time. As noted in note 8 above, individual capacity claims require personal involvement by the specific defendant that the plaintiff claims violated his constitutional rights. But a policy-maker who implements

---

[18] The Sixth Amendment claim is easily rejected because the Sixth Amendment is inapplicable in civil cases. *F.T.C. v. Assail, Inc.*, 410 F.3d 256, 267 (5th Cir. 2005). Thus, the Sixth Amendment is not implicated under any of Sawyer's factual allegations.

a policy that causes or results in a violation of the plaintiff's constitutional rights, may face liability in his individual capacity. *See Gates v. Texas Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008) (citing *Baker v. Putnal,* 75 F.3d 190, 199 (5th Cir.1996)). The Court will assume for purposes of the motion to dismiss that Warden Robinson is the policy-maker at the prison, or at least has final policy-making authority with respect to all aspects of the prison including the procedures in the mailroom, and therefore demonstrates the requisite personal involvement for an individual capacity claim.

The same cannot be said, however, with respect to Assistant Warden Jessica Troxclair whose only role appears to have been responding to Sawyer's grievance related to his legal mail. Sawyer therefore fails to state a claim against Troxclair in her individual capacity and those claims must be dismissed.

Sawyer also sued Robinson and Troxclair in their official capacities based on their role in enforcing an allegedly unconstitutional policy with respect to legal mail procedures. As explained above, notwithstanding that Robinson and Troxclair are state employees, if they are enforcing an unconstitutional policy then prospective injunctive relief may be awarded against them in their official capacities to prevent them from doing so again.[19]

---

[19] Of course, a problematic aspect of Sawyer's official capacity claims is that Sawyer is no longer housed at NCCC and therefore faces no threat of future harm from the mail room procedure. Ordinarily, standing to obtain injunctive relief requires that the plaintiff show that there is a reason to believe that he would directly benefit from the relief; in other words, that without such relief he faces a threat of present or future harm. *Plumley v. Landmark Chevrolet, Inc.*, 122 F.3d 308, 312 (5th Cir. 1997). An injunction cannot issue based on a past wrong. *Id.*

Sawyer's legal mail claims fail on all counts because the NCCC's mail room policy, which allows the staff to open legal mail (for the purpose of scanning) outside of the presence of the inmate, is not unconstitutional. Notwithstanding Sawyer's legal research from other jurisdictions, the controlling law in this circuit expressly rejects the proposition that an inmate's rights are violated when *without more* legal mail is opened outside of his presence. *Brewer v. Wilkinson*, 3 F.3d 816, 820-21 (5th Cir. 1993); *see also Jones v. Mail Room Staff*, 74 F. App'x 418, 419 (5th Cir. 2003); *Collins v. Foster*, 603 F. App'x 273, 275 (5th Cir. 2015) (citing *Brewer*, 3 F.3d at 825); *see also McLaughlin v. Lee*, No. 18-0704, 2018 WL 4926341, at *6 (W.D. La. Sept. 17, 2018), *R&R adopted*, 2018 WL 4924030 (W.D. La. Oct. 9, 2018). Therefore, the official capacity claims fails as a matter of law. Moreover, even if the mail room policy implemented by Warden Robinson was found to be unconstitutional, Robinson would be entitled to qualified immunity for the claims against him in his individual capacity because the right upon which Sawyer sues, *i.e.,* the right to be present when his legal mail is opened, was not a clearly established constitutional right "at the time of the defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Freeman v. Texas Dept. of Crim. Justice*, 369 F.3d 854, 863 (5th Cir. 2004) (citing *Price v. Roark*, 256 F.3d 364, 369 (5th Cir. 2001)).

Even beyond the validity of the mail room policy, Sawyer's allegations do not support the inference that his First Amendment rights have been violated by the mail staff's opening his legal mail outside of his presence, either because he was denied access to the courts or because his free speech rights have been abridged. In order to

state a claim for denial of access to courts, a plaintiff must show that he lost an actionable claim or was prevented from presenting such a claim because of the alleged denial. *Lewis v. Casey*, 518 U.S. 343, 356 (1996); *Eason v. Thaler*, 73 F.3d 1322, 1328 (5th Cir. 1996) (holding that to state a sufficient claim of denial of access to the courts, the plaintiff must demonstrate that his position as a litigant was prejudiced as a direct result of the denial of access). Sawyer's allegations do not support this type of injury.

Further, the allegations do not support the inference that Sawyer's mail was ever censored in violation of his First Amendment rights. While censoring of legal mail may be problematic under the First Amendment, the Supreme Court has specially stated in this context that "freedom from censorship is not equivalent to freedom from inspection or perusal." *Wolff v. McDonnell*, 418 U.S. 539, 575–76 (1974).

Sawyer's legal mail claims against Warden Robinson and Assistant Warden Jessica Troxclair are therefore without merit and are dismissed.

Accordingly;

**IT IS ORDERED** that the **Motion to Dismiss Amended Complaint (Rec. Doc. 40)** filed by defendants KECIA CHARLES, sued in her individual capacity, DR. ABDUL KHAN, sued in his individual and official capacity, DR. ROBERT WOOD, sued in his individual capacity, JESSICA TROXCLAIR, sued in her individual capacity, ALVIN ROBINSON, sued in his individual capacity, LIEUTENANT JARED PERANIO, LIEUTENANT NORVEL ORAZIO, AMBER GROS, and DR. LAURENCE DURANTE, sued in his individual and official capacity is **GRANTED IN PART AND DENIED IN PART** as explained above. <u>The Clerk of Court is advised that the sole remaining</u>

<u>defendant following entry of this Order and Reasons will be Warden Alvin Robinson in his individual capacity only</u>. The sole remaining claim in this case is Sawyer's § 1983 retaliation claim against Warden Robinson.

March 29, 2022

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE